### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA

**NICHOLAS BUCHICCHIO**

**VERSUS**

**JAMES LEBLANC, KIRT GUERIN,
CHELSEA JONES, STEVEN JUGE,
MIKE CAZES, AND DOES 1-10**

**CIVIL ACTION NO.**

**JURY TRIAL DEMANDED**

### COMPLAINT FOR DAMAGES

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff Nicholas Buchicchio, who respectfully submits the following Complaint for Damages, and avers as follows:

1.     This case arises out of Defendants' unlawful imprisonment of Plaintiff Mr. Buchicchio.

2.     In short, on March 3, 2021, a judge granted Mr. Buchicchio's motion for credit for time served. As soon as that motion was granted on March 3, 2021, he became eligible for immediate release. But the DOC didn't recalculate his time, and so he remained in custody until May 21, 2021.

3.     In 2017, Nicholas Buchicchio was arrested in Rapides Parish, Louisiana on a warrant for a probation violation.

4.     After Mr. Buchicchio served nearly three years in prison, Judge Mary Doggett of the 9th Judicial District Court ordered that Mr. Buchicchio should be immediately released by giving him credit for time-served.

5.     Though Judge Doggett ordered Mr. Buchicchio's immediate release on January 17, 2020, he was not released until February 11, 2020.

1

6.      After his release, Mr. Buchicchio moved to Florida and began to rebuild his life. He was offered a job in the U.S. Virgin Islands managing a condominium complex, and the condominium company paid for Mr. Buchicchio to travel to the Virgin Islands to meet with his potential new employers.

7.      On the way home from meeting his new employers, Mr. Buchicchio was arrested in the Miami airport on June 20, 2020 pursuant to a warrant issued by the Department of Public Safety and Corrections ("DOC").

8.      DOC's warrant claimed that Mr. Buchicchio had not yet completed his sentence, despite the Judge Doggett's January order that Mr. Buchicchio had served his time and should be immediately released.

9.      Mr. Buchicchio was transported back to Louisiana and spent the next eleven (11) months in DOC's custody at Elayn Hunt Correctional Center ("Hunt"), located in St. Gabriel, Iberville Parish, Louisiana, and at the West Baton Rouge Parish Transitional Work Facility because of DOC's failure to follow Judge Doggett's order.

10.     Mr. Buchicchio's incarceration coincided with the early height of the COVID-19 pandemic and thus was locked-down to a two-man cell for nearly his entire time at Hunt.

11.     Mr. Buchicchio implored DOC to review his record and Judge Doggett's order in his case.

12.     However, DOC continued to ignore Judge Doggett's order and confine Mr. Buchicchio under lockdown at Hunt.

13.     Mr. Buchicchio filed a grievance with DOC, demanding that DOC review his record and release him pursuant to Judge Doggett's order.

14.     DOC continued to refuse to consider Judge Doggett's order giving Mr. Buchicchio credit for time-served.

15.     In September 2020, Mr. Buchicchio filed a pro se "Motion to Clarify" his sentence, which was set for hearing on November 30, 2020.

16.     DOC refused to bring Mr. Buchicchio to court for his hearing on the motion, so the motion was passed and reset for a later date.

17.     On March 3, 2021, Mr. Buchicchio's Motion to Clarify came before Judge Doggett, and Mr. Buchicchio was brought before the court for the motion hearing.

18.     At the hearing on Mr. Buchicchio's motion, Judge Doggett again ordered that Mr. Buchicchio be immediately released.

19.     Despite the clarity of the Judge's order, Defendants again ignored Judge Doggett's order, and continued to imprison Mr. Buchicchio.

20.     On May 21, 2021, Mr. Buchicchio's family contacted an outside attorney, who wrote an email to DOC's counsel seeking Mr. Buchicchio's immediate release.

21.     Mr. Buchicchio was finally released from this unlawful incarceration on May 25, 2021.

22.     This case addresses the overdetention from March 3, 2021 to May 25, 2021.

23.     The law is clear that jailors may not imprison inmates beyond their sentences. *See Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) ("There is a Clearly Established Right to Timely Release from Prison").

24.     Once a person's sentence has been served, jailors have a reasonable time in which to process and release the individual. Courts have repeatedly held that any time in excess of 48 hours is considered unreasonable. Any detention that exceeds that 48-hour timeframe is

considered "overdetention" and constitutes a violation of the individual's state and federal constitutional rights. *See Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005) ("The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible."). In some cases, juries have found overdetentions as short as thirty minutes to be a constitutional violation. *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004).

25.     In 2021, Mr. Buchicchio endured approximately 84 days of incarceration a beyond his lawful release date as a direct result of Defendants' failure to timely obey the orders of Judge Doggett, causing him to suffer damages.

## JURISDICTION AND VENUE

26.     Plaintiff's claim arises under the Constitution and the laws of the United States. This Court has jurisdiction over Plaintiff's claims of federal rights violations, enforceable under the Fourteenth Amendment and 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's Louisiana false imprisonment claim in accordance with 28 U.S.C. § 1367.

27.     The venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in Iberville Parish, Louisiana situated in the Middle District of Louisiana.

## PARTIES

### *Plaintiff*

28.     Plaintiff **Nicholas Buchicchio** is of suitable age and capacity to file this suit. Plaintiff is a resident of Collier County, Florida.

*Defendants*

29.     Defendant **James LeBlanc**, Secretary of the Louisiana Department of Public Safety and Corrections and is the final policy maker for the Department. He is sued in his individual capacity.

30.     Defendant **Kirt Guerin**, Warden of Elayn Hunt Correctional Center, is the head supervisor and policy maker for Hunt. He is sued in his individual capacity.

31.     Defendant **Chelsea Jones** is a Louisiana Department of Public Safety and Corrections employee. She is the Corrections ARDC Specialist. She is sued in her individual capacity. On information and belief, she is domiciled in Louisiana.

32.     Defendant **Steven Juge**, Chief of Corrections of the West Baton Rouge Transitional Work Facility ("WBR Work Release"), is the head supervisor and policy maker for WBR Work Release. He is sued in his individual and official capacities.

33.     Defendant Sheriff **Mike Cazes**, is the Sheriff of West Baton Rouge Parish. He is sued in his official capacity.

34.     Defendants **Does 1 to 10** are as-yet unknown individuals or entities involved in the overdetention of Plaintiff. They are sued in their official and individual capacities.

## I.     <u>FACTS</u>

**A.     Nicholas Buchicchio, a non-violent offender, served his sentence and was released on February 11, 2020.**

35.     In 2017, Mr. Buchicchio was living in Rapides Parish, Louisiana while on probation for an offense he was previously convicted of in Florida.

36.     On March 13, 2017, Mr. Buchicchio was arrested in Rapides Parish, Louisiana for violating his probation by committing a theft offense.

37.     Mr. Buchicchio pled guilty to the probation violation, his probation was revoked, and he was remanded to Florida's Department of Corrections to serve his sentence.

38.     Mr. Buchicchio completed his sentence in Florida and was sent back to Rapides Parish for proceedings related to the theft offense that caused his probation to be revoked.

39.     Mr. Buchicchio arrived in Rapides Parish on May 6, 2019, and was incarcerated in the parish jail.

40.     On January 17, 2020, Mr. Buchicchio pled guilty to the theft offense and was sentenced to seven years in prison with credit for time served.

41.     Judge Mary Doggett of the 9th Judicial District Court for the Parish of Rapides made it clear that Mr. Buchicchio was to receive credit for all the time he had already served, including the time he spent detained in the parish jail and incarcerated in Florida, and that his new sentence was to run concurrent with all other sentences.

42.     Specifically, Judge Doggett ordered that Mr. Buchicchio was to receive credit for serving time from March 13, 2017.

43.     The Court acknowledged that this sentence entitled to immediate release pursuant to Act 280, which provides that a non-violent offender is entitled to "diminution of sentence by good behavior and performance of work or self-improvement activities, or both, to be known as "good time," at a rate of thirteen days for every seven days in custody. This means that a non-violent offender is entitled to release after they have accrued good time equaling approximately 35% of their total sentence.

44.     As of the date of sentencing. January 17, 2020, Mr. Buchicchio had served two (2) years and ten-and-one-half (10.5) months of "good time" in prison.

45.    Under Act 280, Mr. Buchicchio was entitled to release after serving approximately two (2) years and five (5) months of "good time" in prison. Accordingly, Mr. Buchicchio was entitled to immediate release as of the date of his sentencing.

46.    Despite his entitlement to immediate release, Mr. Buchicchio continued to be imprisoned at the Rapides Parish Prison until he was released on February 11, 2020.

**B.    Mr. Buchicchio is Unlawfully Rearrested Due to DOC's Failure to Accurately Calculate his Release Date.**

47.    After his release, Mr. Buchicchio returned to Florida where he once lived, and began to rebuild his life with his then-fiancee.

48.    Mr. Buchicchio looked for work, and found an opportunity to manage a condominium complex in Christiansted, St. Croix in the U.S. Virgin Islands.

49.    After some preliminary interviews over the phone, Mr. Buchicchio's prospective employers paid for him to travel to St. Croix to visit the grounds of the complex and meet them in person.

50.    The meeting was a success. Mr. Buchicchio was offered the position in St. Croix and planned to accept.

51.    On June 20, 2020, Mr. Buchicchio boarded his return flight from the Virgin Islands to Miami.

52.    At the airport in the Virgin Islands, the authorities told Mr. Buchicchio that there was a warrant for his arrest and that officers would be waiting for him in Miami.

53.    Mr. Buchicchio was baffled as to why there would be an outstanding warrant for his arrest.

54.    Mr. Buchicchio was not handcuffed or otherwise detained and voluntarily boarded the flight to Miami.

55.     Mr. Buchicchio was arrested upon deplaning in Miami.

56.     The warrant for Mr. Buchicchio's arrest was issued by DOC.

57.     The warrant was issued because DOC failed to consider Judge Doggett's order, and, despite releasing Mr. Buchicchio a mere four months earlier, ignored its own prior calculation of Mr. Buchicchio's release date.

**C.     Mr. Buchicchio is Wrongfully Imprisoned on "Lockdown" at a DOC Facility and Kept from Accessing Relief in Court.**

58.     Per DOC's warrant, Mr. Buchicchio was transferred by bus from the airport in Miami, Florida to Elayn Hunt Correctional Center ("Hunt") located in St. Gabriel, Iberville Parish, Louisiana.

59.     Because of the spread of Covid-19 during this time, Mr. Buchicchio was confined to a two-man cell and on "lockdown" for 23 hours per day.

60.     Mr. Buchicchio immediately informed DOC and the staff at Hunt that he was being detained beyond his release date.

61.     He filed a grievance with DOC explaining his situation, specifically that Judge Doggett's order instructed DOC to release him.

62.     DOC and Defendant Jones refused to follow Judge Doggett's order, denying Mr. Buchicchio's grievance request for release on August 17, 2020.

63.     After receiving DOC and Defendant Jones' correspondence refusing to follow Judge Doggett's order, Mr. Buchicchio prepared a pro se "Motion to Clarify/Modify Sentence – Clarification of Credit for Time Served" (the "Motion").

64.     On September 21, 2020, the Ninth Judicial District Court for the Parish of Rapides received Mr. Buchicchio's Motion and set it for hearing.

65.    DOC, particularly Defendant Guerin and the staff at Hunt, failed to transport Mr. Buchicchio to the hearing or otherwise provide him virtual access to the hearing that was set on Mr. Buchicchio's Motion, requiring the court to delay the hearing and further extending Mr. Buchicchio's overdetention.

66.    DOC, Guerin and Hunt failed on at least two other occasions to transport or otherwise give Mr. Buchicchio to the Motion hearing, again delaying Mr. Buchicchio's release.

67.    In fact, Mr. Buchicchio was not permitted to access the Court's hearing on his motion until he was transferred from Hunt to the WBR Work Release center in early March, 2021.

68.    On March 3, 2021, Mr. Buchicchio was finally permitted by DOC to attend a virtual hearing on his Motion.

69.    He was accompanied at the virtual hearing by Defendant Juge.

70.    Judge Doggett was confused and frustrated by DOC's continued detention of Mr. Buchicchio and unambiguously directed DOC to immediately release him.

71.    The minute entry for that hearing notes that the "Court granted [Mr. Buchicchio's] motion" and that the "Court ordered that [he] receive credit for time served specifically while on detainer since the time of 10.16.2017 until 5.7.2019."

72.    Defendant Juge was present at the virtual hearing and heard Judge Doggett's order and instructions.

73.    Defendant Juge told Buchicchio after the hearing that he would be going home immediately.

**D.     Despite Judge Doggett's Unequivocal Order Directing DOC to Immediately Release Mr. Buchicchio, DOC Continued to Imprison Mr. Buchicchio for Nearly Three Months.**

74.     Despite Defendant Juge's presence at the March 3, 2021 hearing where Judge Doggett order Mr. Buchicchio's release, Defendant Juge and DOC refused to release Mr. Buchicchio until May 25, 2021.

75.     Mr. Buchicchio asked Juge why he had not yet been released several times after the March 3rd hearing.

76.     Juge did not give Mr. Buchicchio any reason why he had not been released, at times expressing confusion as to why Buchicchio was still imprisoned.

77.     After Mr. Buchicchio asked Juge several times about DOC's continuing failure to release him, Juge responded that the matter was "out of his hands."

78.     In light of Mr. Buchicchio's continuing detention despite the Court's clear orders, Mr. Buchicchio's family contacted an attorney to assist.

79.     On May 21, 2021, Rebecca Ramaswamy of The Promise of Justice Initiative contacted Jonathan Vining, counsel for DOC.

80.     Ms. Ramaswamy's May 21st email informed Mr. Vining that Mr. Buchicchio was "eligible for immediate release on March 3, 2021, but is currently in West Baton Rouge work release."  She continued, "Since Mr. Buchicchio is now past his proper release date, would you please expedite calculation of his time and release him as soon as possible?"

81.     On May 25, 2021, four days after Ms. Ramaswamy's email, Mr. Buchicchio was finally released from his wrongful incarceration.

**E.     James LeBlanc, and the Louisiana Department of Safety and Corrections, have exhibited a continuing pattern of overdetention.**

82.     The Department of Public Safety & Corrections has a well-documented pattern of overdetention. For example, in *Chowns v. LeBlanc*, La. 37th JDC 26-932, DOC employees testified as to the consistent overdetention they observed:

a.  Tracy Dibenetto, a former DOC employee, testified that DOC staff have discovered approximately <u>one case of overdetention per week for the last nine years</u>. Ms.  Dibenetto also testified that inmates are sometimes incorrectly incarcerated for periods of up to a year.

b.  Henry Goines, a DOC employee whose job was to review sentence computations for the assistant secretary, testified that he typically discovered "one or two [inmates] a week" who were eligible for immediate release.

c.  Cheryl Schexnayder, a DOC records analyst, testified that in the course of her job, she had looked at inmates' sentences and found that they had been done wrong and the inmate was entitled to immediate release.

d.  Sonja Riddick, a DOC employee, responded to the question: "Did you ever find a time when you looked at an inmate's records and you say, this man should be out now?" with the answer: "<u>Oh yes</u>."

83.     The DOC's own counsel has admitted to the DOC's pattern of overdetention. On March 8, 2018, Attorney General Jeff Landry wrote an op-ed conceding that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."[1]

84.     Similarly, Defendant LeBlanc has presided over and been aware of a pattern of overdetention.

85.     In 2012, the Louisiana DOC had a team of a dozen of its staff perform a "Lean

---

[1]     Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018) (emphasis added).

Six Sigma"[2] review of its inmate time calculation processes.

86.    Secretary James LeBlanc was one of the three "champions" of the project.

87.    The Lean Six Sigma review found that as of January 2012, the DOC had a "1446 backlog of cases to have time computed," resulting in an average processing delay of 110 days. And once those inmates had their time finally calculated, more than 83% of them were eligible for "immediate release upon processing . . . due to an earlier release date."

88.    As a result, the team found that in May 2012, there was an average of 71.7 "Overdue days" for inmates eligible for immediate release. Interventions by the Lean Six Sigma team reduced, but did not eliminate the problem. After their interventions, the "average # of days each Immediate Release is past their release date" was reduced from 71.7 to 60.52 days. The team estimated that if the overdue time could be cut in half, it would save the state $3.7 million per year.

89.    The problem was so well known, that personnel even from unrelated departments would casually mention the pattern of overdetention. On April 1, 2015, Dr. Raman Singh, head of DOC medical, wrote an email to James LeBlanc that noted that "So many times, many of the [inmates receiving good time credits] become eligible for an 'immediate release' once all the credits are computed." He noted this was a problem because it left a very short window for infectious disease testing before release.

90.    Despite the cost savings, the DOC did not fix the overdetention problem. In October 2017, the Louisiana Legislative Auditor released a report detailing an audit it had conducted into the DOC. The report was entitled "Management of Offender Data: Processes for Ensuring Accuracy." The Auditor found a number of problems, including basic data errors at a

---

[2]    "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, *Lean Six Sigma*, Investopedia.com (Feb. 5, 2018).

rate of 26 errors per 100 inmates.

91.    Compounding this, the Auditor found that the "DOC's process for calculating offender release dates is inconsistent, which can result in errors."

92.    As a result, the Auditor found that "an offender could be held too long if the release date was miscalculated and not caught until shortly before release." For example, the Auditor "asked two DOC staff to calculate release dates on the same offender, and each staff used a different method to calculate the release date. The two results differed by 186 days."

93.    The DOC did its own investigation that year and came up with an enormously disturbing result: "In 2017, DPS&C had an average of **200 cases per month** considered an 'immediate release' due to these deficiencies."

94.    The DOC concluded that this pattern of overdetention was costing the state "$2.8M per year in housing costs alone."

95.    In August 2018, DOC staffers created an Excel spreadsheet titled "Avg Days Overdue" which revealed an average of 38.6 "days overdue."

96.    As of 2018, the DOC website read "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." (At his 2019 deposition, LeBlanc testified that "12 weeks is ridiculous... I haven't fixed that yet, but that's something we need to address too. I mean, that's just absurd.")

97.    In February 2019, Secretary LeBlanc was forwarded an email in which Judge Edwards of the 15th JDC, who was also involved in the Lean Six Sigma study, attached three articles about overdetention in Louisiana and information about a specific overdetained person. Judge Edwards added that "defense attorneys in Lafayette are also complaining about the failure

to timely release inmates from LPCC." Secretary LeBlanc responded that it was a "poorly written article."

98.    In September 2019, the DOC issued a Strategic Plan, approved by Secretary LeBlanc, for FY 2020-2021 TO 2024-2025. It had no goals about overdetention. But it did have goals of "Maintain the adult offender institution population in state prisons at a minimum of 99% of design capacity through 2025." And for Prison Enterprises, "Increase sales dollars by 5% by 2025."[3] And "Decrease percentage of customer complaints by 10% by 2025." And "Provide 100% on-time deliveries by 2025."

99.    At least two times, Secretary LeBlanc has promised under oath to amend the strategic plan to add goals about mitigating overdetention.

100.    He never has.

101.    In December 2019, Courtland Morgan of the DOC's legal department wrote about overdetention resulting from CTRP credits not being given, which he said was a problem because it is causing "delay in the release of the offender and potentially subjecting the Department to liability and litigation."

102.    No steps were taken to fix that problem.

103.    Despite all this, Secretary LeBlanc admitted that there has *not been a single example of* "discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates, from 2000 to the present."

104.    LeBlanc has never set a goal of releasing all inmates on time, in any strategic plan or other document.

105.    In a 2022 deposition, LeBlanc admitted that "Q So part of the problem is, some

---

[3]    DOC 5 Year Strategic Plan, Sept. 2019, at pg. 35.

people are eligible for immediate release upon sentencing, but there's not a system in place to get them quickly released, correct? A Correct."

106.    As a result, the problem continues to the current day. In February 2019, according general counsel for the Department of Corrections, "231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free."

107.    After finding no remedy elsewhere, Petitioner has initiated this action.

## II.    CLAIMS FOR RELIEF

### Count One – Violation of Due Process Pursuant to 42 U.S.C. § 1983
### (All Defendants)

108.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein *in extenso*.

109.    The Due Process Clause of the Fourteenth Amendment is violated when a prisoner is incarcerated without legal authority. *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980).

110.    Even if a prisoner is lawfully detained at the beginning of their incarceration, holding that prisoner beyond the period of their lawful sentence is a due process violation. *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N.D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

111.    Once a prisoner's lawful sentence has expired, a jailer is allowed a reasonable amount of time to process and release them, but that time must be well short of forty-eight hours to be considered reasonable. *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set

out in *McLaughlin*."). Once a detainee is ordered to be released, there is substantially less tolerance for "administrative delay" than in the context of arrestees awaiting probable cause determinations. *See Berry v. Baca*, 379 F.3d 764, 771-72 (9th Cir. 2004); *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir. 2003); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1353 (N.D. Ga. 2005).

112.    Even within a 48-hour period, the question of reasonableness is often left to juries and overdetentions as brief as 30 minutes have been found to violate the constitution. *See, e.g., Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (resulting in $100,000 jury verdict (upheld on appeal) for plaintiff for 1 hour overdetention at court holding cell and 2 1⁄2 hours at jail after release order); *Barnes, supra*, ("[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two and a half hour detention following acquittal presented jury question under Fourth Amendment).

113.    Here, Mr. Buchicchio's lawful sentence expired on January 17, 2020, and he should have been released from prison that day.

114.    After Mr. Buchicchio completed his lawful sentence, Defendants issued a warrant for Mr. Buchicchio's arrest that falsely asserted that Mr. Buchicchio had not completed his sentence.

115.    Mr. Buchicchio was then detained by Defendants for 11 months.

116.    Moreover, Defendants refused to permit Mr. Buchicchio to access the court system so that he could remedy Defendants unlawful conduct.

117.    When Mr. Buchicchio was finally permitted to attend a court hearing regarding his over-detention nearly eight months after his wrongful arrest, the Court made clear that Mr.

Buchicchio was to be released immediately. Yet, Defendants continued to detain Mr. Buchicchio for an additional 84 days.

118.    Due to Defendants' unlawful actions and omissions, Mr. Buchicchio suffered loss of liberty, great mental anguish, humiliation, degradation, and emotional pain and suffering, and other grievous and continuing injuries.

119.    By depriving Mr. Buchicchio of his fundamental right to liberty, Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As Defendants were acting under the color of state law, Plaintiff's claims are actionable under 42 U.S.C. § 1983.

120.    Defendants continue to persist in this illegal overdetention of individuals.

121.    Defendants actions were undertaken with malice and with reckless disregard for Plaintiff's rights.

## Count Two – Violations of the Louisiana Constitution
### (All Defendants)

122.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein in extenso.

123.    Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

124.    By reason of the same conduct that violated Mr. Buchicchio's federal constitutional rights, Defendants violated his state constitutional rights to liberty and due process.

125.    This conduct resulted in Mr. Buchicchio's overdetention and caused the, emotional, and pecuniary damages as described above and below.

126.    Defendants continue to engage in this unconstitutional conduct resulting in the over detention of other individuals.

**Count Three – State Law False Imprisonment**
**(Defendant Steven Juge in his individual and official capacity, Sheriff Mike Cazes in his official capacity, and James LeBlanc, Kirt Guerin, and Chelsea Jones in their individual capacities)**

127.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein *in extenso*.

128.    The tort of false imprisonment in Louisiana "occur[s] when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority." 353 So.2d 969 (La., 1977); *see also Miller v. Desoto Regional Health Sys*., 128 So.3d 649, 655-56 (La. App. 3 Cir. 2013). This has been distilled into "the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Thomas v. Gulotta* (M.D. La., 2017); *see also Kennedy v. Sheriff of E. Baton Rouge*, 935 So.2d 669, 690 (La. 2006).

129.    There is no need that the unlawful detention be an intentional act by Defendants or that there must be evidence of malice. *Fontenot v. Lavergne*, 365 So.2d 1168 (La.App. 3d Cir.1978); *Prisk v. Palazzo*, 95–1475, pp. 4–5 (La.App. 4 Cir. 1/19/96), 668 So.2d 415, 417 ("The civil cause of action for false imprisonment requires proof of restraint without color of legal authority . . . There is no requirement of proving that the confinement be intentional.").

130.    Here, Mr. Buchicchio was detained, which fulfills the first element.

131.    The second element – that the detention be unlawful – is fulfilled as Mr. Buchicchio was overdetained despite Judge Doggett's order that entitled Mr. Buchicchio to immediate release on January 17, 2020.  *See Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

**Count Four – State Law Negligence**
**(All Defendants)**

132.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein *in extenso*.

133.    Defendants' conduct of overdetention described above caused Mr. Buchicchio harms as described above and below.

134.    Due to their professional roles as jailers, Defendants owed duties to avoid overdetention and other harms to persons in their custody, including Mr. Buchicchio.

135.    These duties were breached by Defendants' acts and omissions, including the failure to timely release Mr. Buchicchio even after the error was repeatedly brought to Defendants' attention by Mr. Buchicchio, Judge Doggett and finally by the Ms. Ramaswamy.

136.    After Mr. Buchicchio was first released in February 2020, a duty was also breached by Defendant(s) Doe when they recalculated Mr. Buchicchio's sentence, erroneously concluded that Mr. Buchicchio had not completed his sentence and issued a warrant for his arrest.

137.    The risks and harms that Defendants caused were within the scope of protection afforded by the duties they owed to Mr. Buchicchio.

138.    As a result of Defendants' acts and omissions, Mr. Buchicchio suffered actual and foreseeable harm.

**Count Five – Failure to Intervene**
**(All Defendants)**

139.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein *in extenso*.

140.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Mr. Buchicchio's constitutional rights, even though they had the opportunity to do so.

141.    As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Mr. Buchicchio suffered emotional distress. Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

### Count Six – *Monell/Hinojosa* and Failure to Train/Supervise
### (Defendants Kirt Guerin, Steven Juge, and James LeBlanc)

142.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein *in extenso*.

143.    The misconduct described above was caused by the policies, practices, and customs of Defendants, in that their employees and agents regularly overdetain persons who are subject to release.

144.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of Defendants, were allowed to exist because policymakers with authority over there acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

145.    The polices, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above. *See Hinojosa v. Livingston*, 807 F. 3d 657, 665 (5th Cir. 2015) ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison

20

official knew of a substantial risk from the very fact that the risk was obvious."), quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

146.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents.

### Count Seven – *Respondeat Superior*
**(Defendants Mike Cazes, Kirt Guerin, Steven Juge, and James LeBlanc)**

147.    Plaintiff incorporates all preceding paragraphs into this Count as if copied herein *in extenso*.

148.    While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the DOC, Hunt, and/or WBR Work Release and acting within the scope of their employment.

149.    Therefore, Defendants Guerin, Hunt and Leblanc are therefore liable as principals for all torts committed by his agents.

### Count Eight – Indemnification
**(Defendants Chelsea Jones, Kirt Guerin, Steven Juge, and James LeBlanc)**

150.    Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

151.    While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the DOC and James LeBlanc and acting within the scope of their employment.

152.    The DOC and Defendant LeBlanc are therefore obligated by Louisiana statute to pay any judgment entered against its employees.

### III.    RELIEF REQUESTED

153.    Wherefore Plaintiff requests judgment be entered against Defendants and that the

Court grant the following:

a.  Declaratory relief;
b.  Judgment against Defendants for Plaintiff's asserted causes of action, for the
    overdetention from March 3, 2021 to May 25, 2021.
c.  Award of compensatory damages;
d.  Award of special damages;
e.  Award of punitive damages;
f.  Award costs and attorney's fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205,
    28 C.F.R. § 35.175, and 29 U.S.C. § 794a(b);
g.  A permanent injunction requiring Defendants to end their practice of
    overdetention.
h.  Order such other and further relief, at law or in equity, to which Plaintiff may be
    justly entitled.

154.    Plaintiff state any and all other causes of action may become known through a

trial of this matter on its merits against any and all other parties which are herein named or which

may be added later, and request any and all other damages or remedies which this Court may

seem equitable.

155.    Plaintiff reserves the right to notice of defect to this pleading and reserve the right

to amend or supplement this Petition after discovery of any additional fact, law or claim, the

amendment of which to be performed by the filing of any subsequent pleading.

Respectfully submitted:

*/s/ Jacob K. Weixler*
Jacob K. Weixler, 36076
WEIXLER LAW LLC
P.O. Box 52197
New Orleans, Louisiana 70152-2197
1926 Washington Ave.
New Orleans, Louisiana 70113-1730
Tel:   (504) 408-2180
Fax:   (504) 814-1728
jkw@weixlerlaw.com

*/s/ William Most*
William Most (La. Bar No. 36914)
Caroline Gabriel (La. Bar. No. 38224)
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
Email: williammost@gmail.com

*Attorneys for Plaintiff*