## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

NICHOLAS BUCHICCHIO                                CIVIL ACTION

VERSUS

JAMES M. LEBLANC, ET AL.                     NO. 22-00147-BAJ-EWD

### RULING AND ORDER

Plaintiff, formerly a prisoner detained by the Louisiana Department of Public Safety and Corrections (DPSC), alleges that prison officials unlawfully delayed his release for twelve weeks after the expiration of his sentence, in violation of his right to due process and various other duties.

Now before the Court are motions to dismiss filed by Defendants DPSC Secretary, James LeBlanc; Chief of Corrections of the West Baton Rouge Transitional Work Facility, Steven Juge; and Sheriff of West Baton Rouge Parish, Mike Cazes. (Docs. 28, 29). For reasons below, Plaintiff's due process and indemnification claims against Sheriff Cazes will be dismissed. Otherwise, Defendants' motions will be denied.

### I. ALLEGED FACTS

The following allegations are drawn from Plaintiff's operative Amended Complaint (Doc. 21), or are otherwise subject to judicial notice,[1] and are accepted as

---

[1] The Court accepts Defendants' invitation to consider the following documents, in addition to the allegations set forth in Plaintiff's Amended Complaint: (1) Plaintiff's January 21, 2020 Uniform Commitment Order, entered by Judge Mary Doggett of the Ninth Judicial District Court for the Parish of Rapides (Doc. 28-2); (2) the March 3, 2021 Minute Entry of the Rapides Parish Clerk of Court, reflecting Judge Doggett's Order granting Plaintiff's *pro se* Motion to

true for present purposes:

In 2017, Plaintiff lived in Rapides Parish, Louisiana, and was serving a term of probation for a prior conviction in Florida.

On March 13, 2017, Rapides Parish authorities arrested Plaintiff for theft. Plaintiff was initially booked at the Rapides Parish jail, and then returned to Florida where he pleaded guilty to violating the terms of his probation. The Florida court revoked Plaintiff's probation, and remanded Plaintiff to Florida's Department of Corrections to serve his sentence. (Doc. 21 at ¶¶ 33-35).

On May 6, 2019, Plaintiff completed his Florida sentence and returned to Rapides Parish for proceedings related to the underlying theft offense(s). Upon arrival, Plaintiff was again incarcerated at the Rapides Parish jail. (*Id.* at ¶¶ 36-37).

On January 16, 2020, Plaintiff appeared before Judge Mary Doggett of the

---

Clarify/Modify Sentence (Doc. 28-3); and (3) the certified transcript of the March 3, 2021 Zoom hearing on Plaintiff's Motion To Clarify/Modify Sentence (Doc. 29-2). These documents are referenced throughout Plaintiff's Amended Complaint, and are cited as the basis of Plaintiff's entitlement to immediate release as of March 3, 2021. Further, these documents are public judicial records subject to judicial notice *without* converting Defendants' Rule 12 motions to motions for summary judgment. Fed. R. Evid. 201.

Additionally, the Court takes judicial notice of the January 25, 2023 final Report of the U.S. Department of Justice Civil Rights Division, titled "Investigation Of The Louisiana Department Of Public Safety & Corrections" (*hereinafter*, the "DOJ Report"), which presents the DOJ's findings regarding the pervasive practice of overdetention at DPSC. The DOJ Report is readily available on the DOJ's website, is generally known within the territorial jurisdiction of this Court, is not subject to reasonable dispute, and bears directly on the issues under review in this action (as set forth below). *See United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001); *see also Hope v. Pelzer*, 240 F.3d 975, 979 (11th Cir. 2001) (taking judicial notice of DOJ report advising Alabama Department of Corrections that use of hitching post was improper corporal punishment and was not acceptable use of restraints), *reversed on other grounds*, 536 U.S. 730 (2002). The DOJ report is available at: https://www.justice.gov/opa/press-release/file/1564036/download (visited Feb. 15, 2023).

Ninth Judicial District Court for the Parish of Rapides ("Ninth JDC"), and pleaded guilty to 10 counts of theft between $5,000-$25,000, in violation of La. R.S. § 1467(b)(2) (2014). (Doc. 28-2 at p. 1). At the same January 16 appearance, Judge Doggett sentenced Plaintiff to seven years imprisonment on each count, "sentences on each count … to run concurrent with each other," with credit for *all* time served—in Louisiana *and* Florida—from the date of Plaintiff's initial arrest. (*Id.*). As a result, Plaintiff was entitled to immediate release from custody. Still, Plaintiff was detained in Rapides Parish for two additional weeks, until his release on February 11, 2020. (Doc. 21 at ¶¶ 38-44).

After his release, Plaintiff returned to Florida, intending to rebuild his life. In June 2020, Plaintiff secured an interview for a job managing a condominium complex in St. Croix, U.S. Virgin Islands. Plaintiff's prospective employer paid for Plaintiff's travel to St. Croix to meet in person and visit the grounds. Plaintiff landed the job and planned to accept. On his return to Florida, however, St. Croix airport authorities informed Plaintiff of an outstanding warrant for his arrest, and that law enforcement would be waiting to detain him in Miami. Baffled, and unaware of any outstanding warrant, Plaintiff nonetheless voluntarily boarded his flight. Sure enough, airport authorities arrested Plaintiff in Miami, based on an outstanding warrant issued by DPSC. (*Id.* at ¶¶ 45-54).

DPSC's warrant was a mistake, the result of DPSC's failure to properly calculate Plaintiff's release date under Judge Doggett's January 16, 2020 Commitment Order, despite having *released* Plaintiff four months earlier. Under the

warrant, Plaintiff was returned to Louisiana, and imprisoned at the Elayn Hunt Correctional Center (EHCC) during the height of the COVID-19 pandemic. Due to pandemic protocols, Plaintiff was confined to a two-man "lockdown" cell 23 hours per day. (*Id.* at ¶¶ 55-57).

Upon arriving at EHCC, Plaintiff immediately informed DPSC of its mistake, and that he was being detained beyond his release date. Plaintiff filed an administrative grievance explaining his situation, and that he was entitled to immediate release as of the date of his sentencing hearing (January 16, 2021) under Judge Doggett's Commitment Order. On August 17, 2020, DPSC denied Plaintiff's grievance. (*Id.* at ¶¶ 58-60).

After DPSC's denial, Plaintiff submitted a *pro se* "Motion to Clarify/Modify Sentence" (the "Motion to Clarify" or "Motion") to the Ninth JDC, seeking a hearing before Judge Doggett to correct DPSC's error. The Ninth JDC initially set Plaintiff's Motion for hearing on September 21, 2020, but DPSC caused Plaintiff to miss this hearing by failing to provide transport to the courthouse or, alternatively, allowing Plaintiff access to EHCC's remote (Zoom) conferencing facilities. Plaintiff's hearing was delayed *twice* more, each time due to DPSC's failure to provide transport or access to Zoom conferencing technology. (*Id.* at ¶¶ 61-64).

In early March 2021, DPSC transferred Plaintiff from EHCC to the West Baton Rouge Transitional Work Facility ("WBRWRC"), where Plaintiff's detention continued under the authority and supervision of Defendants Chief Juge and Sheriff Cazes. (*Id.* at ¶¶ 65-66).

On March 3, 2021, Plaintiff finally appeared before Judge Doggett (by Zoom) for a hearing on his Motion to Clarify. Chief Juge *attended* this hearing. Still *pro se*, Plaintiff explained the basis of his Motion—stating that his current detention (eight months and counting) was a mistake due to DPSC's miscalculation of his release date and the resulting erroneous warrant—and requested an order reaffirming that he received credit for time served on detainer in Florida. (Doc. 29-2). The transcript of Plaintiff's March 3 hearing states (in relevant part):

> **The Court:** Okay, so what you're wanting at this point is [to] let the minutes reflect that you're getting credit for time served. I already have that in the minutes, but you wanted it to specifically say, including time served 10/16/2017 through May 7, 2019?

> **Mr. Buchicchio:** Yes, ma'am because what had happened was, actually DOC released me in March of last year and then rearrested [sic] because there was an error in my release because the jail credits got all messed up.

> **The Court:** Okay. I mean, I don't usually - that's a DOC function, but I don't mind just putting that one entry, that you would - because you were on detainer while in Florida, I don't mind amending the minutes and I'll do that for you today. So, if the District Attorney has no objection, I would amend the [sic] minutes to reflect that Mr. Buchicchio would be getting credit for time served on his sentence of - when was he sentenced? 01/16 right? Okay, so we're going to amend that, those minutes to reflect that he be given credit for time served and then the amendment will be to include, and specifically credit for time served on detainer from May 8th - no, from October 16, 2017 through May 7, 2019. Okay?

> **Mr. Buchicchio:** Yes, ma'am. Thank you so much.

> **The Court:** We'll try it. Alright. Good luck. Thank you.

(Doc. 29-2 at pp. 3-4).

Judge Doggett issued a minute entry Order the same day of the hearing (March 3), stating:

> Accused present without counsel. State represented by K SANDERS.
> Defendant is present via zoom Conference. For Motion(s) MTN CREDIT
> FOR TXME SERVED-Defendant explained his motion to the Court.
> State has no objection to giving the defendant credit for time served
> while on detainer. Court ordered that the defendant receive credit for
> time served specifically while on detainer since the time of 10.16.2017
> until 5.7.2019. Court granted defendants [sic] motion.

(Doc. 28-3 at p. 1).

Plaintiff contends that during the March 3 hearing—a portion of which is *not* transcribed due to a "*[s]ide conversation off mic*" (Doc. 29-2 at p. 3 (emphasis in original))—Judge Doggett "was confused and frustrated" by Plaintiff's ongoing detention, and made clear that he should be released. (*Id.* at ¶¶ 66-70).

Despite attending the March 3 hearing, Chief Juge failed to promptly arrange for Plaintiff's release, or even seek an expedited recalculation of Plaintiff's release date. Instead, after the hearing, Chief Juge told Plaintiff that he (Chief Juge) was "going home." Thereafter, for *twelve weeks* DPSC failed to process Plaintiff's release. During this time, Plaintiff repeatedly confronted Chief Juge and inquired about the delay. In response, Chief Juge "at times express[ed] confusion as to why [Plaintiff] was still imprisoned," but never gave an explanation, ultimately stating that the matter was "out of his hands." (*Id.* at ¶¶ 71-76).

Finally, in the face of DPSC's inexplicable failure to act on Judge Doggett's March 3 Order, Plaintiff's family contacted an attorney to assist. On May 21, 2021, an attorney from The Promise of Justice Initiative emailed counsel for DPSC, stating that Plaintiff was "eligible for immediate release on March 3, 2021 but is currently in West Baton Rouge work release." Counsel's email continued, "[s]ince Plaintiff is now past his proper release date, would you please expedite calculation of his time and

release him as soon as possible?" Just four days later, on May 25, 2021, DPSC freed Plaintiff from custody. (*Id.* at ¶¶ 77-80).

Plaintiff alleges that his over-extended detention is the result of a well-documented and systemic practice of overdetention at DPSC—affecting *hundreds* of detainees each *month*. Plaintiff contends that Defendant Secretary LeBlanc has expressly and repeatedly acknowledged this problem, yet has failed to correct it, as detailed by the U.S. Court of Appeals for the Fifth Circuit in *Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022), *and*, even more recently, by the U.S. Department of Justice in its January 25, 2023 Report, titled "Investigation Of The Louisiana Department Of Public Safety & Corrections" (hereinafter, the "DOJ Report"). Plaintiff alleges that widespread overdetention at DPSC is the result of *both* a failure to adopt policies to address the issue, *and* a failure "to implement sufficient training or any legitimate mechanism for oversight or punishment of" DPSC employees responsible for calculating inmate release dates. (Doc. 21 at ¶¶ 81-105, 144-45).

Plaintiff's allegations are substantiated by the DOJ Report, which follows a two-year investigation into DPSC's time computation and release practices, spearheaded by the DOJ's Civil Rights Division, and assisted by Louisiana's three United States Attorney's Offices. (DOJ Report at § III). The DOJ Report details multiple policy failures resulting in overdetention at DPSC, including (1) failure to adopt policies related to the delivery of sentencing paperwork for individuals housed in parish jails (*id.* at § V(B)(2)(a)); (2) failure to adopt adequate time computation processes (*id.* at § V(B)(2)(b)); and (3) failure to train DPSC employees regarding

7

"complex aspects of release date calculations that are likely to drive errors, namely the variety of issues that may emerge on account of the numerous, and sometimes unique, factors guiding a given calculation," (*id.* at § V(B)(2)(c)). Significantly, the DOJ Report expressly affirms Secretary LeBlanc's actual awareness of these problems, *and* potential fixes:

> During the Department's investigation, both Secretary James LeBlanc, [DPSC]'s Chief Executive Officer, and [DPSC]'s Undersecretary of the Office of Finance and Management acknowledged that restructuring the Basic Jail Guidelines and [Cooperative Endeavor Agreements with parish jails] to require the timely delivery of sentencing documents from the parish jails is entirely within [DPSC]'s control.

> Secretary LeBlanc further acknowledged that [DPSC] could institute a policy of tracking the frequency of delayed or deficient preclass[2] packets in order to identify the specific parish jails contributing to these issues and address them accordingly

(*Id.* at § V(B)(2)(a)).

> The DOJ Report's conclusions are damning and unequivocal:

> [DPSC] incarcerates thousands of individuals each year beyond their legal release dates in violation of the Fourteenth Amendment of the United States Constitution. These violations are pursuant to a pattern or practice of infringements on the constitutional rights of incarcerated persons.

> While people convicted of a crime and sentenced to prison must serve their time, [DPSC] routinely confines people far past the dates when they are legally entitled to be released from custody. Since at least 2012, more than a quarter of the people set for release from [DPSC]'s custody each year are instead held past their release date, in violation of the due process protections of the Constitution. These violations are severe, systemic, and are both caused and perpetuated by serious ongoing

---

[2] DPSC "Preclass"—or "Preclassification Department"—is responsible for collecting, maintaining, and managing sentencing information and related records for inmates in DPSC custody. Preclass is also responsible for calculating release dates—referred to as time computations—for inmates in state custody, and for timely processing their release from incarceration. (DOJ Report at § IV(B)).

deficiencies in [DPSC]'s policies and practices. [DPSC] has persisted with these unconstitutional practices despite at least a decade of notice and clear recommendations for fixing the problem.

(*Id.* at § I).

## II.  PROCEDURAL HISTORY

On March 2, 2022, Plaintiff initiated this action, seeking relief *only* for Defendants' alleged failure to immediately release him following Judge Doggett's March 3 Order—in other words, for the twelve-week period of detention beginning March 3, 2021, and ending May 25, 2021. (Doc. 1 at ¶ 22). Against all Defendants, Plaintiff alleges due process violations under the Fourteenth Amendment *and* Article I, Section 2 of the Louisiana Constitution (Count 1, 2, 6); false imprisonment (Count 3); and negligence (Count 4). (Doc. 21 at ¶¶ 107-136, 141-145).

Additionally, against Chief Juge only, Plaintiff alleges a claim of failure to intervene to prevent his unconstitutional overdetention (Count 5). (*Id.* at ¶¶ 137-140).

Against Sheriff Cazes only, Plaintiff alleges claims of *respondeat superior* liability for Chief Juge's unlawful acts (Count 7) and indemnification (Count 8). (*Id.* at ¶¶ 146-151).

Plaintiff seeks declaratory and injunctive relief requiring DPSC "to end [its] practice of overdetention," and compensatory, special, and punitive damages. (*Id.* at ¶ 152).

Now, Defendants each move to dismiss Plaintiff's action in full, with prejudice, asserting a variety of defenses, including qualified immunity. (Docs. 28, 29). Plaintiff opposes Defendants' motions. (Docs. 32, 37).

### III.    LAW AND ANALYSIS

#### A. Standard

Defendants invoke two mechanisms for dismissal under Federal Rule of Civil Procedure ("Rule") 12: Rule 12(b)(1) (Secretary LeBlanc); and Rule 12(b)(6) (Secretary LeBlanc, Sheriff Cazes, and Chief Juge). Still, the analysis is functionally the same. The critical issue is whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) ("A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.").

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679. Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Hence, the complaint need not set out "detailed factual allegations," but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555. When conducting its inquiry, the Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).

### B. Discussion

#### i. Chief Juge

Chief Juge attacks Plaintiff's action on multiple grounds, arguing (1) Plaintiff's due process claims are defeated by qualified immunity (Doc. 29-1 at pp. 11-15); (2) Plaintiff's failure to intervene claim fails because Plaintiff cannot establish that he was overdetained, much less that Chief Juge knew of his overdetention, (Doc. 29-1 at pp. 10-11); and (3) Plaintiff's false imprisonment and negligence claims are either implausible or fatally flawed (Doc. 29-1 at pp. 15-17).

#### a. Due Process[3]

Qualified immunity shields a government official from individual liability for civil damages when the "official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019). Its purpose is to strike a balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties" by making it possible for government officials to "reasonably anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting

---

[3] The Fourteenth Amendment's Due Process Clause and the Louisiana Constitution's Due Process Clause are "nearly identical in language," are "coextensive," and "provide the same due process protection." *Robinson v. St. Tammany Par. Pub. Sch. Sys.*, 983 F. Supp. 2d 835, 845 n.64 (E.D. La. 2013) (Jolivette Brown, J.) (quoting *State v. Smith*, 614 So.2d 778, 780 (La. App. 2 Cir. 1993)), *aff'd*, 569 F. App'x 303 (5th Cir. 2014). Further, Louisiana's two-part test for qualified immunity is indistinguishable from the federal test. *See Moresi v. State Through Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1085–86 (La. 1990). Accordingly, the analysis as to whether Plaintiff has plausibly alleged a due process violation "is the same under either constitution," *Robinson*, 983 F. Supp. 2d at 845 n.64, and the reasoning set forth herein applies equally to Plaintiff's federal and state due process claims.

*Davis v. Scherer*, 468 U.S. 183, 195 (1984)). Put differently, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Fifth Circuit's two-pronged test for qualified immunity asks (1) "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," and (2) "whether the right was 'clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020). A court may analyze these prongs in either order, and resolve the case on a single prong. *Id.* at 190. Importantly, "[a]lthough nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009).

To  determine whether a constitutional right was "clearly established" at the time of the alleged violation, the Court looks for guidance from controlling Supreme Court and Fifth Circuit authority. *See McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002). "A right is 'clearly established' only if it 'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Cunningham*, 983 F.3d at 191 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The "salient question" is "'whether the state of the law at the time of the state action gave the state actors fair warning that their alleged treatment of the plaintiff was unconstitutional.'" *McClendon*, 305 F.3d at 329 (quoting *Roe v. Texas Dep't of*

*Protective & Regul. Servs.*, 299 F.3d 395, 409 (5th Cir. 2002)); *see also Mullenix*, 577 U.S. at 12 ("The dispositive question is whether the violative nature of the *particular* conduct is clearly established." (quotation marks omitted)).

Applying this framework, Plaintiff's allegations overcome Chief Juge's qualified immunity defense. Here, it bears repeating that liberty—the freedom from arbitrary and unlawful restraint—is the most fundamental of all rights that our Constitution was intended to protect. Indeed, it is the right from which all other constitutional rights flow.

> At the center of the Framers' dedication to the separation of powers was individual liberty. The Federalist No. 47, at 302 (J. Madison) (quoting Baron de Montesquieu for the proposition that "'[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'"). This was not liberty in the sense of freedom from all constraint, but liberty as described by Locke: "to have a standing rule to live by ... made by the *legislative power*," and to be free from "the inconstant, uncertain, unknown, arbitrary will of another man." J. Locke, Second Treatise of Civil Government § 22, p. 13 (J. Gough ed. 1947). At the heart of this liberty were the Lockean private rights: life, liberty, and property. If a person could be deprived of these private rights on the basis of a rule (or a will) not enacted by the legislature, then he was not truly free. *See* D. Currie, The Constitution in the Supreme Court: The First One Hundred Years, 1789–1888, p. 272, and n. 268 (1985).

*Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 75–76 (2015) (Thomas, J., concurring in the judgment); *see also Boumediene v. Bush*, 553 U.S. 723, 797 (2008) (observing that the most important of "freedom's first principles" is the "freedom from arbitrary and unlawful restraint"); *Slaughter-House Cases*, 83 U.S. 36, 118 (1872) (observing that "the right of not being deprived of life, liberty, or property, without due process of law" rises "above all" other rights secured by the Constitution).

Naturally, then, it is indisputable that at the time of his alleged overdetention,

Plaintiff enjoyed a "clearly established right to timely release from prison" upon completion of his sentence. *Crittindon*, 37 F.4th at 188 (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)).

> Of course, "timely release" is not the same as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge. While courts have declined to define the amount of delay that is reasonable, it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process.

*Crittindon*, 37 F.4th at 188 (footnotes and citations omitted); *see also Porter*, 659 F.3d at 445 ("Detention of a prisoner for over 'thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.'" (quoting *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980)). To the point, "overdetention by thirty days is a per se deprivation of due process." *Crittindon*, 37 F.4th at 191 (citing *Douthit*, 619 F.2d at 532). Here, Plaintiff alleges that he was detained for *twelve weeks* past his release date. Under any measure, Plaintiff has alleged a due process violation. *Id.*

The remaining question is whether Plaintiff's allegations establish that a reasonable jailer in Chief Juge's position would know that his conduct violated Plaintiff's right to timely release. *Cunningham*, 983 F.3d at 190-91. Here, again, the answer is obvious.

> Our precedent establishes that a jailer has a duty to ensure that inmates are timely released from prison. We have explained that while not a surety for the legal correctness of a prisoner's commitment, a jailer is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release."

*Porter*, 659 F.3d at 445 (quotation marks and alterations omitted).

Plaintiff alleges that Chief Juge (1) *attended* the March 3 hearing at which Plaintiff explained the calculation error resulting in his unlawful June 2020 arrest and detention; (2) *heard* Judge Doggett's ruling granting Plaintiff's Motion to Clarify; and, as a result, (3) *knew* that Plaintiff received "credit for time served on detainer [in Florida] … from October 16, 2017 through May 7, 2019," (Doc. 29-2 at p. 4), yet (4) *took no discernable action* to re-calculate Plaintiff's release date, or effect Plaintiff's release for *twelve weeks*. In the meantime, Plaintiff (5) repeatedly confronted Chief Juge, who, in response, disclaimed responsibility and stated that the matter was "out of his hands." (Doc. 21 at ¶¶ 71-76).

Faced with these alleged circumstances, a reasonable jailer in Chief Juge's position would have, at a *minimum*, promptly sought recalculation of Plaintiff's release date, which allegedly would have confirmed DPSC's original error and resulted in Plaintiff's immediate release. *See Hicks v. LeBlanc*, 832 F. App'x 836, 840 (5th Cir. 2020) ("A prisoner's right to timely release was clearly established well before 2017, when [defendant's] actions began to occur. A reasonable DPSC employee also should have known to credit time served when calculating an inmate's release date, where the court ordered such credit to be considered."); *Hicks v. Dep't of Pub. Safety & Corr.*, 595 F. Supp. 3d 463, 476–77 (M.D. La. 2022) (Dick, C.J.) (same). Instead, despite alleged actual notice of Plaintiff's overdetention, Chief Juge did nothing, allowing Plaintiff to remain detained for nearly two months *beyond* that which the Fifth Circuit instructs is a "per se deprivation of due process." *Crittindon*, 37 F.4th at 191. Again, by any measure, Plaintiff's allegations establish that a

reasonable jailer in Chief Juge's position would know that his conduct violated his "duty to effect [Plaintiff's] timely release." *Porter*, 659 F.3d at 445; *see Hicks*, 595 F. Supp. 3d 482–83 (denying qualified immunity defense at Rule 12(b)(6) stage to DPSC employee who allegedly knew that plaintiff was due to be released based on sentencing court's order that plaintiff be given credit for all time served, but delayed plaintiff's release for 60 days beyond completion of his sentence).

### b. Failure To Intervene

"[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quotation marks omitted). Chief Juge blithely challenges Plaintiff's failure to intervene claim, asserting that "Plaintiff has failed to show either that he was being confined in violation of the United States Constitution … [or that] Juge knew that Plaintiff was being overdetained." (Doc. 29-1 at pp. 10-11). This bald denial simply ignores Plaintiff's allegations establishing that Chief Juge knew as of March 3, 2021 that Plaintiff received credit for time served on detainer in Florida, yet took no discernable action to ensure that Plaintiff's release date was re-calculated. Chief Juge's challenge fails for essentially the same reasons set forth above.

### c. Negligence And False Imprisonment

Finally, Chief Juge meekly challenges Plaintiff's tort claims, arguing that "Plaintiff's negligence and false imprisonment 'counts' are, in reality, a single cause of action"; and that, in any event, Plaintiff's allegations fail to establish the elements

16

of actionable claims for negligence and false imprisonment. (Doc. 29-1 at pp. 16-17). These arguments are quickly dispatched.

First, this Court has repeatedly rejected Chief Juge's argument that Plaintiff cannot pursue claims for negligence *and* false imprisonment, merely because their elements dovetail. *See Hicks*, 595 F. Supp. 3d at 486–87 (discussing authorities).

Chief Juge's objection to Plaintiff's negligence claim is equally unpersuasive. Chief Juge challenges only the duty element,[4] arguing that he was "not ordered by any controlling authority to release Plaintiff," and, thus, cannot have violated any duty to ensure that Plaintiff was timely released.  (Doc. 29-1 at p. 17). Jurisprudence is clear, however, that a jailer's "duty to ensure that inmates are timely released from prison" extends *beyond* merely processing an inmate's release order. *See Porter*, 659 F.3d at 445. Rather, the jailer is charged broadly with "carry[ing] out the functions of his office," *id.*, to include "credit[ing] time served when calculating an inmate's release date, where the court ordered such credit to be considered." *Hicks*, 832 F. App'x at 840.

As alleged, at all relevant times Chief Juge was Chief of Corrections at WBRWRC. In this position of authority, Chief Juge plausibly owed Plaintiff a duty to, at minimum, ensure that DPSC properly re-calculated Plaintiff's release date

---

[4] Whether Chief Juge owed Plaintiff a duty is a question of law. *Doe v. McKesson*, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 531. Under Louisiana law, a defendant's duty of care may arise from statute, jurisprudence, or even "general principles of fault." *Jenkins v. Hernandez*, 2019-0874 (La. App. 1 Cir. 6/3/20), 305 So. 3d 365, 372, *writ denied*, 2020-00835 (La. 10/20/20), 303 So. 3d 315. "There is a 'universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another.'" *Doe*, 339 So. 3d at 531 (quoting *Boykin v. La. Transit Co.*, 707 So.2d 1225, 1231 (La. 1998)).

following Judge Doggett's March 3 Order *restating* that Plaintiff received credit for time served on detainer in Florida. Instead, Chief Juge allegedly took no action to effect Judge Doggett's Order, plausibly breaching his duty to ensure Plaintiff's timely release. In turn, Chief Juge's alleged breach was plausibly the cause-in-fact of Plaintiff's injury (overdetention), and Plaintiff's alleged overdetention was within the scope of the duty breached. As such, Chief Juge's alleged nonfeasance was plausibly the "but for" cause of Plaintiff's injury. *See McKesson*, 339 So. 3d at 532. Weighing all allegations and reasonable inferences in Plaintiff's favor, Plaintiff's "claim for relief is sufficiently plausible to allow him to proceed to discovery." *McKesson*, 339 So. 3d at 532; *accord*, *Hicks*, 595 F. Supp. 3d at 487 (denying DPSC employees' motion to dismiss plaintiff's negligence claim based on alleged 60-day overdetention, where plaintiff alleged that each employee "played some part in investigating and/or recalculating Plaintiff's release date and failed to ensure his legal release after application of 110 days of [time served] credit").

Plaintiff's false imprisonment claim follows suit. Under Louisiana law, false imprisonment consists of "two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Hicks*, 595 F. Supp. 3d at 486 (quoting *Hernandez v. Theriot*, 709 F. App'x 755, 758 (5th Cir. 2017)). Plaintiff has plausibly alleged that he was unlawfully detained for twelve weeks following Judge Doggett's March 3 Order, and that Chief Juge knew of the overdetention and was in position to do something about it, yet did nothing. The elements are met. This claim merits discovery to determine the nature of Chief Juge's specific conduct and authority with

18

regard to Plaintiff's detention. *See id.* (denying DPSC employees' motion to dismiss plaintiff's false imprisonment claim based on alleged 60-day overdetention).

### ii.    Sheriff Cazes

Sheriff Cazes seeks dismissal of Plaintiff's action on essentially the same grounds as Chief Juge, adding that Plaintiff's claims of vicarious liability and indemnity fail because Plaintiff cannot establish an underlying tort committed by Chief Juge. (Doc. 29-1 at pp. 17-18).

### a. Due Process[5]

Plaintiff's due process claims against Sheriff Cazes are more difficult to discern. Plaintiff pursues Sheriff Cazes *only* in his official capacity as Sheriff of West Baton Rouge Parish, where Sheriff Cazes "employs" Chief Juge and is "responsible for the operations, supervision, and policies at WBRWRC." (Doc. 21 at ¶ 31; *see also id.* at ¶¶ 107-125). As such, Plaintiff's claims are, in fact, claims against the West Baton Rouge Parish Sheriff's Office, presumably for implementing a policy that resulted in Plaintiff's alleged overdetention, *or* for failing to properly train and supervise Chief Juge. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 396 (5th Cir. 2009) ("Because official capacity suits are really suits against the governmental entity, Goodman's attempt to hold Hickman liable for failing to train and supervise Ashabranner, if in his official capacity, is subsumed within her identical claim against Harris County.").

The problem here is that to succeed under either theory, Plaintiff must identify

---

[5] Again, this section's analysis applies equally to Plaintiff's federal and state due process claims. *Supra*, n.3.

a Sheriff's Office policy (or lack thereof) that was the "moving force" behind his overdetention. *In re Foust*, 310 F.3d 849, 861 (5th Cir. 2002) (quoting *Brown v. Bryan County, Okla.*, 219 F.3d 450, 457 (5th Cir. 2000)); *see also Goodman*, 571 F.3d at 396. Simply being Chief Juge's employer is *not* enough. *Foust*, 310 F.3d at 861 ("In § 1983 suits against the county or governmental officials in their official capacities, … the courts apply neither qualified immunity nor state respondeat superior doctrines."). But while Plaintiff's Amended Complaint is chock-full of allegations establishing that *Secretary LeBlanc* failed to implement policies to address overdetention at *DPSC*, and that this failure predictably resulted in Plaintiff's overdetention (addressed below), *no* allegations establish the same as to Sheriff Cazes or the Sheriff's Office. Rather, it appears that Sheriff Cazes is sued in his official capacity merely because he "employs" Chief Juge. That will not work. *Foust*, 310 F.3d at 861. Plaintiff's official capacity due process claims against Sheriff Cazes must be dismissed.

### b. Negligence And False Imprisonment

Under Louisiana law, Sheriff Cazes—as Chief Juge's employer—may be liable for Chief Juge's tortious on-the-job conduct. La. C.C. art. 2320; *see Russell v. Noullet*, 98-0816 (La. 12/1/98), 721 So. 2d 868, 871 ("The principle of vicarious liability is codified in La. Civ. Code art. 2320, which provides that an employer is liable for the tortious acts of its employees 'in the exercise of the functions in which they are employed.'"). Sheriff Cazes objects to Plaintiff's *respondeat superior* claim solely on the basis that Plaintiff has failed to allege actionable negligence and false

imprisonment claims against Chief Juge.[6] (Doc. 29-1 at pp. 17-18). Having determined that Plaintiff's tort claims against Chief Juge may proceed, it follows that Plaintiff has alleged actionable *respondeat superior* claims against Sheriff Cazes.

Plaintiff's claim for "indemnity" is another matter. As this Court has explained, "[i]ndemnity permits 'a party not actually at fault, whose liability results from the fault of others' to recover from those parties at fault." *Allied World Nat'l Assurance Co. v. Nisus Corp.*, 21-cv-00431, 2022 WL 2708746, at *4 (M.D. La. July 12, 2022) (Jackson, J.) (quoting *Nassif v. Sunrise Homes, Inc.*, 739 So.2d 183, 186 (La. 1999)). As a general rule, indemnity claims are pursued only by *defendants* or *third-party plaintiffs*. *See id.* In this case, however, there is no counterclaim that puts Plaintiff in position to seek indemnity from Sheriff Cazes (or any other party). Nor has Plaintiff cited any authority allowing him to seek indemnity where he has not first been made a defendant to the action. Accordingly, Plaintiff's indemnity claim is purely speculative, and must be dismissed. *E.g.*, *Fletcher v. Whittington*, No. 18-cv-1153, 2022 WL 3459459, at *2 (W.D. La. Aug. 17, 2022) (Hicks, C.J.) (dismissing plaintiff's claim for indemnity against the Bossier Parish Police Jury arising from the

---

[6] Sheriff Cazes also baldly asserts that "Plaintiff's Louisiana state law claims are prescribed and, *ipso facto*, there can be no claim." (Doc. 29-1 at pp. 17-18). This statement comes out of the blue, and is not accompanied by any argument or authority. The Local Civil Rules require that parties support their arguments with "a concise statement of reasons ... and citations of authorities," M.D. La. LR 7(d), and this Court has repeatedly admonished that it will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf. *Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, --- F.Supp.3d ----, 2023 WL 143171, at *17, n.13 (M.D. La. Jan. 10, 2023) (Jackson, J.). Pursuant to the Court's Local Rules, and consistent with the general rule that a party's failure to adequately brief an issue acts as a waiver, Sheriff Cazes has (for present purposes) waived his challenge to the timeliness of Plaintiff's tort claims. *See id.*

tortious acts of Bossier Parish Sheriff's Office employee-defendants because "such a claim for indemnity, even if one exists, would be an action personal to the named individual defendant").

### iii.    Secretary LeBlanc

Secretary LeBlanc argues that the Court lacks jurisdiction to consider Plaintiff's official capacity due process claims (Doc. 28-1 at pp. 2-7); that Plaintiff's individual capacity due process claims are defeated by qualified immunity (*id.* at pp. 13-20); and that Plaintiff's tort claims are implausible (*id.* at pp. 20-22).

### a. Due Process[7]

### 1. Official Capacity

Again, Plaintiff's official capacity claims against Secretary LeBlanc are, in reality, claims against DPSC. *Goodman*, 571 F.3d at 396. Plaintiff seeks declaratory relief and an injunction requiring DPSC "to end [its] practice of overdetention." (Doc. 29 at ¶¶ 29, 152(a), (g)). Secretary LeBlanc objects, arguing that the Court lacks subject matter jurisdiction over these claims because any equitable relief must redress an *ongoing* constitutional violation, but here Plaintiff alleges that his unlawful overdetention ended in May 2021. (Doc. 28-1 at pp. 2-7). Thus, Plaintiff runs afoul of *Ex parte Young's* requirement that an official capacity claim must "seek prospective relief to redress ongoing conduct," *Williams On Behalf of J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020) (citing *Ex parte Young*, 209 U.S. 123, 167–68 (1908)), *and* Article III's requirement that the alleged injury or threat of injury cannot be

---

[7] And, again, this section's analysis applies equally to Plaintiff's federal and state due process claims. *Supra*, n.3.

"conjectural or hypothetical." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

The Court is not convinced on the present showing. First, black letter law provides that Plaintiff may establish Article III standing even when the alleged injury has abated, provided that he shows "a real and immediate threat of repeated injury." *Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) (quoting *Deutsch v. Annis Enterprises, Inc.*, 882 F.3d 169, 173 (5th Cir. 2018)). Here, Plaintiff's allegations establish a plausible basis to conclude that he may *still* be subject to unlawful detention based on DPSC's ongoing failure to properly compute and process his release.

Accepting Plaintiff's allegations as true, DPSC's system for calculating release dates and processing release paperwork is in utter disarray. (Doc. 21 at ¶¶ 86-95). As a result of various alleged factors—including data-entry entry backlogs, inconsistent methods for calculating release dates, and outright "incompetence" (*id.* at ¶¶ 82, 86, 90-91)—DPSC fails to timely release 200 detainees per month *on average*, at a taxpayer cost of nearly $2.8 million per year.[8] (*Id.* at ¶ 92-93).

---

[8] Against this backdrop, Louisiana consistently ranks as the "incarceration capital" of the United States, imprisoning more of its population, per capita, than any other state. *See* U.S. Department of Justice Office of Justice Programs (Bureau of Justice Statistics), *Prisoners in 2021 – Statistical Tables* (Dec. 2022), at Table 7 (Imprisonment rates of U.S. residents, based on sentenced prisoners under the jurisdiction of state or federal correctional authorities, by sex, age, and jurisdiction, 2020 and 2021), *available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/p21st.pdf (visited Feb. 15, 2023). Although the wisdom of preserving this dubious distinction may be a policy-matter beyond this Court's jurisdiction, plainly it is the Court's constitutional duty to intervene when the State endeavors to detain its citizens *without* lawful authority, *beyond* their release dates. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

And the threat of overdetention continues even *after* a prisoner is released, as illustrated by Plaintiff's own story. Plaintiff alleges that with credit for time served on detainer in Florida, he was eligible for release on January 16, 2020, the same day he was sentenced for the 10 underlying theft offenses. It took *two weeks* (until February 11), but he was eventually released from Rapides Parish jail and returned to Florida, intending to turn his life around. Plaintiff was heading in the right direction until June 2020, when he allegedly traveled to the U.S. Virgin Islands to obtain employment, and was arrested on his return based on a mistaken warrant issued by DPSC. (*Id.* at ¶¶ 45-54).

Allegedly, the warrant was issued solely due to DPSC's miscalculation of his release date, which inexplicably occurred even *after* he had already been released. Thereafter, DPSC allegedly imprisoned Plaintiff without lawful authority for *eleven months*, until May 25, 2021, despite Plaintiff's dogged efforts to convince DPSC of its error. As alleged, even the circumstances of Plaintiff's May 25 release are problematic, raising more questions than answers. How, after failing to calculate and process Plaintiff's release for *79 days* after Judge Doggett's March 3, 2021 Order, did DPSC manage to get its affairs in order a mere *4 days* after an email exchange between Plaintiff's attorney and DPSC? Is DPSC's May 25 release paperwork complete and correct so as to ensure that Plaintiff is not unlawfully detained the next time he boards an airplane to seek employment, or was Plaintiff let loose *without* proper paperwork to avoid the nuisance of a contracted battle with Plaintiff's counsel?

Plaintiff's liberty hinges on the answers to these questions of fact, which

plainly cannot be addressed without discovery. Until then, Plaintiff's allegations establish a reasonable basis to infer that he faces a real and immediate injury (unlawful detention) the next time he passes through airport security, or, for that matter, is stopped for a traffic violation.[9] *Cf. Ghedi*, 16 F.4th at 464 (frequent-flier plaintiff alleged injury in fact sufficient to pursue Fourth Amendment unlawful detention claim against Transportation Security Administration: "On these facts we can reasonably infer that his next flight, and thus injury, is both real and immediate. Therefore, he has plausibly alleged an injury in fact under Article III."); *Penix v. U.S. Parole Comm'n*, 979 F.2d 386, 388 (5th Cir. 1992) (parolee plaintiff alleged injury in fact sufficient to challenge legality of unexecuted parole violator warrant: "The injury Penix alleges is the incarceration that would result instantaneously from the warrant's execution. Although presently unexecuted, the execution of the parole violator warrant at any time would result in Penix's immediate incarceration, and he would remain in custody until his hearing[.]").

And because Plaintiff's official capacity claim against Secretary LeBlanc seeks prospective declaratory and injunctive relief aimed to eliminate this real and

---

[9] Remarkably, in his reply memorandum, Secretary LeBlanc highlights an allegation that does *not* appear in Plaintiff's July 15, 2022 Amended Complaint: specifically, that **"Plaintiff … was recently detained again 'because [DPSC] failed to update a national database to show Mr. Buchicchio has served his sentence and was lawfully (albeit belatedly) released.'"** (Doc. 33 at p. 2, n.1 (emphasis added)). To be clear, this new "allegation"—which appears for the first time in Plaintiff's October 3, 2022 opposition memorandum, (*see* Doc. 37 at p. 20), and is not supported by an affidavit—does *not* factor into the Court's Rule 12 analysis above. Rather, the Court's analysis relies solely on the well-pleaded allegations set forth in the Amended Complaint, and the reasonable inferences drawn from those allegations. Still, counsel's representation—which the Court must assume is made in good faith under Rule 11—is deeply troubling, and reinforces the conclusion that Plaintiff's official capacity claims against Secretary LeBlanc must proceed to discovery.

immediate threat, Plaintiff may proceed without running afoul of *Ex parte Young* and the Eleventh Amendment. *Williams*, 954 F.3d at 736.

## 2. Individual Capacity

Plaintiff pursues two different theories of individual capacity liability against Secretary LeBlanc, alleging that Secretary LeBlanc failed to implement policies to prevent Plaintiff's overdetention, and that Secretary LeBlanc failed to train DPSC employees regarding how to calculate and process release dates. (Doc. 21 at ¶¶ 144-145). Secretary LeBlanc objects to each claim. (Doc. 28-1 at pp. 13-20).

### a) Failure To Adopt Policies

A supervisory official who is not directly involved in a constitutional violation may nonetheless be liable for his "failure to adopt policies if that failure causally results in a constitutional injury." *Crittindon*, 37 F.4th at 186, 188 (citing *Porter*, 659 F.3d at 446). A plaintiff asserts a viable "failure to adopt policies" claim when the allegations plausibly establish that the supervisory official acted, or *failed* to act, with "deliberate indifference," that is, "a disregard for a known or obvious consequence of [his] actions." *Id.* (quotation marks and alterations omitted)). Further, the plaintiff must plausibly allege that the supervisory official had "actual or constructive notice" that his failure to adopt policies would result in the alleged constitutional violation. *Id.* "This typically requires showing notice of 'a pattern of similar constitutional violations' due to deficient policies, permitting the inference that [the defendant] deliberately chose policies causing violations of constitutional rights." *Id.* (alterations omitted; quoting *Porter*, 659 F.3d at 447)).

Secretary LeBlanc argues that Plaintiff's failure to adopt policies claim fails

26

each prong of the qualified immunity analysis because (1) Plaintiff does not sufficiently allege deliberate indifference, or a causal connection between Secretary LeBlanc's alleged policy failure and Plaintiff's alleged overdetention; and (2) Plaintiff fails to show that Secretary LeBlanc's conduct was unreasonable in light of clearly established law. (Doc. 28-1 at pp. 13-20).

These objections are eight months past their expiration date, having already been shot down by the Fifth Circuit in *Crittindon*.[10] In *Crittindon*, as here, the plaintiffs alleged that they were DPSC prisoners entitled to immediate release as of the date of their sentencing hearings. 37 F.4th at 184. In *Crittindon*, as here, DPSC allegedly detained the plaintiffs for months beyond their release dates. *Id.* at 184. In *Crittindon*, as here, the plaintiffs pursued failure to adopt policies claims against Secretary LeBlanc, alleging that he turned a blind eye to an administrative failure that he "knew was leaving prisoners in jail who had served their sentences." *Id.* at 181. In *Crittindon*, as here, Secretary LeBlanc cloaked himself in qualified immunity. *Id.* at 185.

This Court *and* the Fifth Circuit rejected Secretary LeBlanc's gambit. In doing so, the Circuit *affirmed* its decades-old rule that "overdetention by thirty days is a per se deprivation of due process," *Crittindon*, 37 F.4th at 191 (citing *Douthit*, 619 F.2d at 532), and *flatly* dismissed the *same* objections raised by Secretary LeBlanc here, based on *actual* evidence developed in discovery:

---

[10] On January 31, 2023, the Fifth Circuit issued its order denying *en banc* rehearing of in *Crittindon*. *Crittindon v. LeBlanc*, No. 20-30304, 2023 WL 1228310 (5th Cir. Jan. 31, 2023). As such, *Crittindon* is the law of the Circuit. The *Crittindon* case will proceed to trial upon its return to this District.

Defendants [LeBlanc, Stagg, and Griffin] concede that, because of the [Lean Six Sigma] study, they each knew that on average, it took a month for DPSC to receive the paperwork necessary to begin calculating a prisoner's release date after his conviction. Defendants also knew that some prisoners would be entitled to immediate release upon conviction. Therefore, in cases like Plaintiffs', where prisoners were entitled to immediate or near-immediate release upon conviction, it was obvious that a failure to address those processing delays would lead to unconstitutional overdetentions. Despite this awareness, years after the Lean Six Sigma project, Defendants have not pointed to a single effort that any of them took to identify immediate releases more quickly during that month-long delay. And this is despite the fact that LeBlanc and Stagg were responsible for the Basic Jail Guidelines, while Stagg and Griffin were responsible for running DPSC's Pre-Classification Department. They were each in a position to adopt policies that would address this delay.

*Id.* at 187.

*Crittindon*—which denied Secretary LeBlanc's qualified immunity defense at the summary judgment stage, after development of an evidentiary record—squarely forecloses Secretary LeBlanc's qualified immunity defense here, at the Rule 12(b)(6) stage. How could it not? Plaintiff's allegations that are the foundation of his failure to adopt policies claim are mined from the same summary judgment *evidence* that defeated Secretary LeBlanc's qualified immunity defense in *Crittindon*. (Doc. 21 at ¶¶ 81-105).

Indeed, by one measure, Plaintiff's allegations establish an even greater degree of callousness and indifference than demonstrated by Secretary LeBlanc in *Crittindon*: this case allegedly involves a 96-day overdetention that occurred in 2021, four years *after* the *Crittindon* plaintiffs initiated their lawsuit in this District. In other words, after obtaining actual knowledge that the *Crittindon* plaintiffs were detained for months beyond their release dates, Secretary LeBlanc allegedly *still*

28

failed to implement policies aimed to prevent Plaintiff's *twelve-week* overdetention. (*See* Doc. 21 at ¶¶ 102-104). Plaintiff alleges that "the problem continues to the current day." (*Id.* at ¶ 105).

In sum, under *Crittindon*, Plaintiff's allegations that Secretary LeBlanc failed to adopt policies to prevent his unlawful detention easily overcome Secretary LeBlanc's qualified immunity defense at this stage.

### b) Failure To Train/Supervise

An unconstitutional failure to train is *not* the same as an unconstitutional failure to adopt policies; each is a distinct theory of *Monell* liability. *Pinder v. Skero*, No. 16-cv-03479, 2017 WL 11612501, at *8 (S.D. Tex. Sept. 6, 2017) (Harmon, J.) ("ratification, failure to train, and other policies, patterns, and practices are generally pled and recognized as distinct theories of *Monell* liability"); *accord Ramos v. Taylor*, --- F.Supp.3d ---, 2022 WL 17815128, at *9-*12 (W.D. Tex. Dec. 19, 2022) (Pitman, J.); *compare Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978) (establishing municipal liability for unlawful policies, practices, and customs), *with City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-88 (1989) (establishing municipal liability for failure to train). Secretary LeBlanc objects briefly (but effectively) to Plaintiff's failure to train claims, asserting that they are conclusory because "[n]o facts with regard to training or supervision are pleaded." (Doc. 28-1 at pp. 14-15).

The point is well-taken. Although the Amended Complaint is replete with allegations establishing Secretary LeBlanc's unconstitutional failure to adopt *policies* to prevent overdetention at DPSC, *supra*, Plaintiff's failure to *train* allegations are limited to one unadorned sentence, stating: "the widespread practices described in

the preceding paragraphs were allowed to flourish because Defendant LeBlanc declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents." (Doc. 21 at ¶ 145). This allegation, standing alone, is speculative and conjectural, and would ordinarily be too thin to sustain Plaintiff's claims. *Twombly*, 550 U.S. at 555.

Here, however, Plaintiff's failure to train claims are resuscitated by the DOJ Report, which provides the factual matter that the Amended Complaint is missing. The DOJ report summarizes its findings regarding DPSC's failure to train its employees as follows:

> [DPSC]'s training programs for the intake and time computation groups further drive errors and delays. All analysts within Preclass receive the same initial orientation training. This training consists of four modules: (1) Verifying Paperwork; (2) Updating CAJUN; (3) Time Computation; and (4) After Time Computation. According to Preclass personnel, **the initial module-based training covers only the basics of Preclass functions and does not address the more complex aspects of release date calculations that are likely to drive errors, namely the variety of issues that may emerge on account of the numerous, and sometimes unique, factors guiding a given calculation.** Further, not all basic Preclass functions are reflected in the module training program. For instance, the modules do not contain instructions on the release date calculation check system or the monthly auditing system, key time computation group functions.
>
> As a result, a significant portion of the on-the-job training for the time computation group takes place either after an error has occurred or concerns about an individual case have been raised. During weekly staff meetings, for instance, supervisors conduct additional trainings for the time computation analysts that range from 30 minutes to two hours depending on the topic. These trainings often involve scenario-based topics based upon observed difficulties or concerns experienced by the analysts. Lastly, there are one-on-one spontaneous trainings that are conducted in response to unusual release date calculation scenarios. These one-on-one trainings may also be conducted in response to observed errors in an analyst's calculations, though they are not informed by monthly release date calculation audit results. **This**

**approach is reactive as opposed to proactively ensuring that each analyst is prepared for the variety of scenarios they are likely to encounter.**

**[DPSC] also insufficiently updates the training materials for its initial orientation modules, which were originally created in 2013 and have not been revised since late 2018.** Given the frequent turnover in the Preclass and known gaps in time computation analysts' preparedness, ensuring the thoroughness of the initial module training program is critical.

(DOJ Report at § V(B)(2)(c) (emphasis added)).

Taking the DOJ Report at face value, DPSC's current training is deficient, reactive, and outdated. Common sense dictates that these training deficiencies plausibly resulted in the miscalculated release date that triggered DPSC's June 2020 warrant for Plaintiff's arrest.[11] On this showing, Plaintiff's failure-to-train claims are also plausible, and may proceed to discovery.[12]

### b. Negligence And False Imprisonment

Finally, Secretary LeBlanc half-heartedly challenges Plaintiff's tort claims, asserting that Plaintiff's false imprisonment claim fails because Plaintiff alleges that he was entitled to immediate release as of the date of his original sentencing hearing (January 16, 2020), yet seeks relief *only* for the alleged overdetention occurring from March 3, 2021 to May 25, 2021, and that Plaintiff's negligence claim fails because

---

[11] Secretary LeBlanc further objects (in a footnote) that Plaintiff's failure to train claims fail because "there is no allegation that Plaintiff's sentence was computed incorrectly." (Doc. 28-1 at p. 15, n.12). This objection is meritless given Plaintiff's allegations that DPSC's June 2020 arrest warrant was a mistake, resulting from DPSC's failure to properly calculate his original release date based on Judge Doggett's January 16, 2020 Commitment Order. (Doc. 21 at ¶ 55).

[12] To be clear, the Court's Rule ruling on Plaintiff's failure-to-train claims is based on the facts set forth in the DOJ Report, which, again, is readily available, is not subject to reasonable dispute, and bears directly on the issues under review in this action. *Supra*, n.1.

"Plaintiff does not allege that LeBlanc, personally, had been notified of an alleged error" that resulted in his overdetention. (Doc. 28-1 at pp. 21-22). Not only are these arguments difficult to understand, they are not supported by any authority. Again, the Local Civil Rules require that parties support their arguments with "a concise statement of reasons ... and citations of authorities," M.D. La. LR 7(d). Pursuant to the Court's Local Rules, and consistent with the general rule that a party's failure to adequately brief an issue acts as a waiver, Secretary LeBlanc has (for present purposes) waived his challenge to Plaintiff's tort claims. *Supra*, n.6.

## IV.    AMENDMENT

Rule 15(a) dictates that the Court should generally allow amendment before dismissing a claim with prejudice, unless amendment clearly would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable"); *see also Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) ("Rule 15(a) requires a trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend." (internal quotations omitted)). Here, Plaintiff has already amended his complaint once, in direct response to Defendants' original motions to dismiss. (*See* Docs. 1, 4, 8, 20). Plaintiff's opposition papers include a perfunctory request to amend again, but Plaintiff provides no explanation regarding how he might improve if granted a third bite at the apple. (Doc. 32 at p. 19; Doc. 37 at p. 22). Again, issues not briefed are waived. *Supra*, n.6. Absent any explanation or argument from Plaintiff, the Court

determines that further amendment would be futile, and serve merely to delay this action from proceeding to discovery and trial.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the **Second Motion To Dismiss Pursuant To Federal Rule Of Civil Procedure 12(b)(6) (Doc. 29)** submitted by Defendants Chief Juge and Sheriff Cazes be and is hereby **GRANTED IN PART**, and that Plaintiff's due process and indemnification claims against Sheriff Cazes be and are hereby **DISMISSED WITH PREJUDICE**. In all other respects, Chief Juge's and Sheriff Cazes' Motion is **DENIED**.

**IT IS FURTHER ORDERED** that Secretary LeBlanc's **Motion To Dismiss First Amended Complaint For Damages (Doc. 28)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that this matter be and is hereby **REFERRED** to the Magistrate Judge for entry of a trial date and a scheduling order.

Baton Rouge, Louisiana, this 15th day of February, 2023

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

33